# United States Court of Appeals

### For the Eighth Circuit

_____

No. 18-3077

_____

D.M., a minor, by Bao Xiong, the mother, legal guardian, and next friend of D.M.;
Z.G., a minor, by Joel Greenwald, the father, legal guardian, and next friend of Z.G.

*Plaintiffs - Appellants*

v.

Minnesota State High School League; Bonnie Spohn-Schmaltz, in her official
capacity as President of the Board of Directors for the Minnesota State High School
League; Erich Martens, in his official capacity as Executive Director of the
Minnesota State High School League; Craig Perry, in his official capacity as an
Associate Director of the Minnesota State High School League; Bob Madison, in his
official capacity as an Associate Director of the Minnesota State High School League

*Defendants - Appellees*

------------------------------

Missouri State High School Activities Association; Arkansas Activities Association;
Nebraska School Activities Association; North Dakota High School Activities
Association; National Federation of State High School Associations

*Amici on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: December 12, 2018
Filed: March 6, 2019
_____

Before LOKEN, MELLOY, and ERICKSON, Circuit Judges.
_____

MELLOY, Circuit Judge.

In 2018, two boys sued their state's high school athletic league and several of its officers for declaratory and injunctive relief under 42 U.S.C. § 1983. The boys alleged that the league violated their rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88 ("Title IX"). Specifically, they claimed that the league unlawfully discriminated against them on the basis of sex through its rule prohibiting boys from participating on high school competitive dance teams. The district court denied the boys' motion for a preliminary injunction, and they appealed. Having jurisdiction under 28 U.S.C. § 1292(a)(1), we reverse and direct the district court to enter a preliminary injunction.

I.

Appellants D.M. and Z.G. are sixteen-year-old boys who attend high school in Maplewood and Minnetonka, Minnesota, respectively. Both are in the eleventh grade. Both are passionate about dance and have participated in various dance classes and programs. Both want to dance on their schools' competitive dance teams but, for reasons explained below, have been prohibited from doing so.

Appellee Minnesota State High School League (the "League") is a non-profit corporation that is a voluntary association of high schools. The League exercises authority delegated to it by the high schools to control high school extracurricular activities and sports throughout the state. To obtain and maintain such control, the

League passes bylaws and rules that set forth the standards member schools use to regulate and supervise those activities and sports.

The League's Bylaw 412 limits participation on a school's competitive dance team to females. The League claims that the reason for this limitation is that girls' "overall athletic opportunities have previously been limited," whereas boys' have not. To support its claim, the League points to data compiled by Amicus National Federation of High School Athletic Associations ("NFHS"). The League also relies on Minnesota law, which allows for gender-based, athletic limitations in certain circumstances. See Minn. Stat. § 121A.04, subdiv. 3 ("[I]n athletic programs operated by educational institutions or public services and designed for participants 12 years old or older or in the 7th grade or above, it is not an unfair discriminatory practice to restrict membership on an athletic team to participants of one sex whose overall athletic opportunities have previously been limited."). Pursuant to Bylaw 412, neither D.M. nor Z.G. have been allowed to participate on their schools' competitive dance teams.

D.M. and Z.G. sued the League in July 2018 for allegedly violating Title IX and their rights to equal protection under the Fourteenth Amendment. Shortly thereafter, the boys moved for a preliminary injunction of Bylaw 412 as it pertains to boys and competitive dance teams. The district court denied the motion. Despite finding that the boys suffered irreparable harm and that "the balance of harms may favor" them, the district court concluded that the injunction was not warranted because the boys were not likely to prevail on the merits. The district court also concluded that the public interest, as reflected in Minnesota Statute section 121A.04, favored denying the injunction. The court explained that "[t]he girls-only dance team rule is substantially related to an important governmental objective"—namely, "increasing girls' athletic opportunities." Moreover, the court said that Title IX permits the League to create girls-only athletic teams such as dance teams. The boys timely filed a notice of appeal.

II.

We review "the denial of a preliminary injunction for abuse of discretion." Gresham v. Swanson, 866 F.3d 853, 854 (8th Cir. 2017). A district court abuses its discretion when it "rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." Jones v. Kelley, 854 F.3d 1009, 1013 (8th Cir. 2017) (per curiam). "We will not disturb a district court's discretionary decision if such decision remains within the range of choice available to the district court, accounts for all relevant factors, does not rely on any irrelevant factors, and does not constitute a clear error of judgment." Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs, 826 F.3d 1030, 1035 (8th Cir. 2016) (quoting PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1142 (8th Cir. 2007)). We review a district court's legal conclusions de novo. Barrett v. Claycomb, 705 F.3d 315, 320 (8th Cir. 2013).

When determining whether to issue a preliminary injunction, the district court considers: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc). Generally, no one of these factors is determinative. Id. at 113. However, "the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied." Barrett, 705 F.3d at 320 (quoting CDI Energy Servs., Inc. v. West River Pumps, Inc., 567 F.3d 398, 402 (8th Cir. 2009)). Consequently, we will begin our review with an analysis of that factor.

A.

There are two standards a district court may apply when assessing a movant's probability of success on the merits. The first, which applies in most instances, directs the district court to ask whether the party requesting a preliminary injunction has a "fair chance of prevailing." Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). This fair-chance standard does

not require the party seeking relief to "show 'a greater than fifty per cent likelihood that he will prevail on the merits.'" Id. at 731 (citation omitted). The second, which we have called a "more rigorous standard," calls on the district court to determine, as a threshold matter, whether the movant is "likely to prevail" on his or her claims. Id. at 733. The likely-to-prevail standard applies when "a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute." Id. at 732. The district court applied the heightened, likely-to-prevail standard because "the challenged policy is supported by a Minnesota statute." The parties dispute whether that was error.

As noted above, the test for determining which standard applies is whether the "preliminary injunction is sought to enjoin the implementation of a duly enacted state statute." Id. We apply a heightened standard in such instances because the duly enacted state statute constitutes "government action based on presumptively reasoned democratic processes," and such action is "entitled to a higher degree of deference and should not be enjoined lightly." Id. at 732 (quoting Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995)). The likely-to-prevail test may also be appropriate when a movant seeks to preliminarily enjoin other forms of government action such as "administrative actions by federal, state or local government agencies." Id. at 732 n.6. However, in those cases, the suggested course of action is to first "evaluate whether 'the full play of the democratic process[]' was involved" in the actions and "then determine which standard would be more appropriate." Richland/Wilkin, 826 F.3d at 1040 (quoting Rounds, 530 F.3d at 732 n.6).

Here, Bylaw 412 can, under Eighth Circuit precedent, rightly be considered government action. See Brenden v. Indep. Sch. Dist. 742, 477 F.2d 1292, 1295 (8th Cir. 1973) (determining that the League "act[ed] under color of state law" for purposes of 42 U.S.C. § 1983 in promulgating rules governing high school athletics). However, the bylaw was not based on the "presumptively reasoned democratic processes" that Rounds contemplated. Rounds, 530 F.3d at 732. Indeed, the creation of the bylaw did not involve "the full play of the democratic process." Id. at 732 n.6; see also

Richland/Wilkin, 826 F.3d at 1040.  There was no lengthy public debate involving both the legislative and executive branches before the formulation of the bylaw and its subsequent enactment.  Cf. Able, 44 F.3d at 131–32 (imposing a heightened likelihood-of-success standard upon a motion to enjoin federal legislation and regulation because "Congress and the President [had] engaged in lengthy public debate before formulating" them).[1]  And the bylaws are created by League-member schools throughout the state, not by democratically elected officials who must answer to their constituents or face the possibility of not being reelected.

To the extent the League argues that the heightened standard applies because it is implementing a state statute, Minnesota Statute section 121A.04, we reject the argument.  Section 121A.04 does not direct the League to do anything; rather, the statute permits the League to discriminate on the basis of sex in limited circumstances—when athletic opportunities for a sex have previously been limited.  The League must still show the continuing lack of opportunity and how the challenged policy addresses that inequity.  Nothing in this action calls into question the validity of the underlying statute.

Consequently, the heightened, likely-to-prevail standard does not apply to the boys' preliminary injunction motion.  We ask, instead, whether the boys have a fair chance of prevailing.

B.

We now turn to the merits of the boys' claims, applying the appropriate standard. The boys argue that the League violated their Fourteenth Amendment equal protection rights when it banned them from participating on their high schools' competitive dance teams because they are male.  The League contends that it is justified in precluding the

---

[1]Able served as an important guide for us when we adopted our heightened, likely-to-prevail test in Rounds. See Rounds, 530 F.3d at 731–33; see also id. at 732 n.6. Able's treatment of when government action represents "the full play of the democratic processes" is, therefore, significant.

boys from the dance teams because doing so constitutes means that are "substantially related to the important governmental interest of redressing past discrimination and providing equal opportunities for women."

On the issue of past discrimination, the parties have submitted a chart that shows, for Minnesota in a given year, the relative percentages of boys and girls enrolled in League-member schools statewide. It then shows the relative percentages of boys and girls among those students participating in interscholastic sports. The underrepresented sex column shows the difference between the percentage of students enrolled and the percentage of students participating in interscholastic sports for whichever gender is underrepresented that year. The chart is reproduced here as follows:

| League-Member School Enrollments and Athletes by Gender | | | | | |
|---|---|---|---|---|---|
| Year | League Members Enrollment Boys | League Members Enrollment Girls | League Athletes Boys | League Athletes Girls | Under-represented Sex |
| 2013–14 | 133,964 (51.3%) | 127,364 (48.7%) | 119,034 (53.2%) | 104,706 (46.8%) | Girls (-1.9%) |
| 2014–15 | 134,879 (51.3%) | 128,128 (48.7%) | 118,899 (52.4%) | 108,084 (47.6%) | Girls (-1.1%) |
| 2015–16 | 136,257 (51.3%) | 129,394 (48.7%) | 121,024 (52.4%) | 110,023 (47.6%) | Girls (-1.1%) |
| 2016–17 | 137,603 (51.4%) | 130,263 (48.6%) | 122,269 (51.1%) | 117,020 (48.9%) | Boys (-0.3%) |
| Average | 135,676 (51.3%) | 128,787 (48.7%) | 120,307 (52.2%) | 109,958 (47.8%) | Girls (-1.0%) |

The same data for 2017–18 shows boys were underrepresented by 0.35%.

The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In the context of gender-based discrimination, the U.S. Supreme Court has interpreted that clause to mean that unless a government actor can meet the "demanding" burden of showing an "exceedingly persuasive" justification for treating males differently from females, the differential treatment is unconstitutional. United States v. Virginia, 518 U.S. 515, 533 (1996); see also Duckworth v. St. Louis Metro. Police Dep't, 491 F.3d 401, 406 (8th Cir. 2007). To successfully justify a classification based on gender, the actor "must show 'at least that the [challenged] classification serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives."'" Virginia, 518 U.S. at 533 (alteration in original) (quoting Miss. Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982)).

The Court has explained that "gender-based classification[s] favoring one sex" that are designed to remedy past discrimination can be justified "[i]n limited circumstances." Miss. Univ., 458 U.S. at 728. Such circumstances exist when the classification "intentionally and directly assists members of the sex that is disproportionately burdened." Id. However, a government actor may "evoke a compensatory purpose to justify an otherwise discriminatory classification only if members of the gender benefited by the classification *actually suffer* a disadvantage related to the classification." Id. (emphasis added). In other words, for a government actor to classify individuals based on gender for the purpose of remedying a prior lack of opportunities, the individuals must continue to lack opportunities or the classification is not constitutionally justified. See id. at 729 (declaring a public university's women-only policy to be unconstitutional because the university had "made no showing . . . that women [were] currently . . . deprived of" opportunities to obtain nursing training or positions of leadership); id. at 730 ("[A]lthough the State recited a 'benign, compensatory purpose,' it failed to establish that the alleged objective is the actual purpose underlying the discriminatory classification.").

-8-

The parties agree that girls historically have been underrepresented in Minnesota high school athletics. However, over the past five years, the representation of girls in Minnesota athletics has been almost directly proportional to the number of girls enrolled at Minnesota schools. In fact, in both the 2016–17 and 2017–18 school years, the parties' means of determining representation show that boys have been slightly underrepresented in high school athletics. Thus, the League has not shown that the underlying problem it initially sought to remedy by creating all-girl teams—the overall underrepresentation of girls in high school athletics—continues to exist, at least in Minnesota.[2] Without this underlying problem to remedy, the League cannot prohibit boys from participating on girls' teams unless it has some other "exceedingly persuasive" justification for doing so. Virginia, 518 U.S. at 533.

The League does not offer any such justification. Instead, it merely argues, in broad terms, that restricting the membership of athletic teams to one sex "advances the important government interest of promoting safety, increasing competition, redressing past discrimination, and providing more athletic opportunities for female athletes." The League also cites a Rhode Island Supreme Court case, Kleczek v. R.I. Interscholastic

_____

[2]The U.S. Department of Education's Office of Civil Rights, the League, and the NFHS all repeatedly stress that girls are underrepresented in high school athletics nationwide. To support their claims, they point to data that show "[o]ver the last four years 1,218,125 (15.6%) more boys participated nationwide in interscholastic sports, on average, than girls." The problem with the data they cite, however, is that the data do not show the total, nationwide number of students enrolled in schools that offer interscholastic athletic programs. Nor do the data break down how many of those students are boys and how many are girls. Without that information, it is impossible to appreciate the extent to which either gender is over- or underrepresented in interscholastic athletics at the national level. There may be more boys than girls participating in interscholastic sports because there are simply more boys than girls enrolled. Moreover, the alleged fact that girls are underrepresented in sports nationwide does not address the question of whether girls are underrepresented in Minnesota so as to justify a bylaw that prohibits boys from joining high school competitive dance teams in that state.

League, Inc., 612 A.2d 734 (R.I. 1992) (per curiam), in which the court held that promoting safety and preserving interscholastic athletic competition for boys and girls are important government interests. Id. at 739. Kleczek, however, in addition to being non-binding, is distinguishable from this case. Kleczek involved a ban on boys participating on girls-only field hockey teams. Id. at 735. The court, understandably, had concerns about participants' safety if boys were allowed on the teams. Id. at 739. Here, the League does not explain how allowing boys to dance on their schools' competitive dance[3] teams would be unsafe or how it would deprive girls of opportunities to compete. Moreover, Kleczek was decided under the Rhode Island constitution, not the U.S. Constitution. Id. at 736. We find the League's asserted other justifications for prohibiting boys from participating on high school competitive dance teams unpersuasive.

Because the League has not asserted an "exceedingly persuasive" justification for keeping boys from participating on high school competitive dance teams, we hold that the boys had more than a fair chance of prevailing on the merits of their case.[4] The district court erred in concluding otherwise.

## C.

Because we conclude that the boys have a fair chance of prevailing on the merits of their equal protection claim, we need not address their probability of success on their Title IX claim. See Richland/Wilkin, 826 F.3d at 1040 ("The plaintiff 'need only

---

[3]In many sports, single-sex teams can be justified if boys enjoy a competitive advantage over girls due to their weight and height. The League has not presented any evidence (and does not seem to seriously argue) that boys enjoy any competitive advantage over girls in dance.

[4]Given the lack of justification for the policy, we have no doubt that the boys could even satisfy the heightened, likely-to-prevail standard if it were applicable.

-10-

establish a likelihood of succeeding on the merits of any one of [its] claims.'" (alteration in original) (citation omitted)). We turn now to the other Dataphase factors.

The district court concluded that the boys "sufficiently demonstrated irreparable harm." We agree. Students who are denied the opportunity to join their schools' sports teams because of their sex may suffer irreparable harm. See Bednar v. Neb. Sch. Activities Ass'n, 531 F.2d 922, 923 (8th Cir. 1976) (per curiam). That is especially true here. Both boys are juniors in high school. They love to dance and want to do so competitively as part of a school team. The League's ban has prohibited them from doing so this year. They cannot get that season back. Without injunctive relief or final resolution of their suit, they will be prevented from competing next year as well. These sorts of injuries, i.e., deprivations of temporally isolated opportunities, are exactly what preliminary injunctions are intended to relieve.

Furthermore, we hold that the district court erred in concluding that the public interest favored denying the injunction. The district court reasoned that "[t]he public interest is evidenced in the Minnesota statute allowing girls-only teams that do not violate Title IX or the Equal Protection Clause." That statement, while true enough, overlooks the fair probability that the League's bylaw violates the Constitution. "[T]he public is served by the preservation of constitutional rights." Phelps-Roper v. Nixon, 545 F.3d 685, 694 (8th Cir. 2008), overruled on other grounds by Phelps-Roper v. City of Manchester, 697 F.3d 678, 692 (8th Cir. 2012) (en banc); see also Awad v. Ziriax, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quoting G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994))). As such, the public interest Dataphase factor favors the boys.

Finally, we hold that the balance of harms tips in favor of granting an injunction. The district court alluded that such may be the case in its memorandum and order, and for good reason. If the injunction is granted, the boys may try out for their schools'

-11-

competitive dance teams. The negative public consequences of such an allowance, if any, will be slight.[5] See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." (quoting Weinberger v. Romero–Barcelo, 456 U.S. 305, 312 (1982))). On the other hand, if the injunction is denied, the boys will continue to suffer irreparable harm—namely, they will be prevented from trying out for and participating on their schools' competitive dance teams in probable violation of their constitutional rights. The balance of harms is decidedly in the boys' favor.

## III.

In sum, all of the Dataphase factors favor granting D.M.'s and Z.G.'s motion for a preliminary injunction. We therefore reverse the judgment of the district court and remand for the district court to issue a preliminary injunction in favor of the boys.

_____

[5]The League argues that "[g]ranting an injunction would fundamentally alter the requirements for MSHSL-sponsored activities and would disregard the unambiguous language of Minn. Stat. § 121A.04." The League worries that were the preliminary injunction to be granted and the boys "subsequently determined ineligible after a trial on the merits," their teams would be required to forfeit "all contests in which [the boys] participated." We do not share the League's concerns. If the injunction is granted, the boys are "eligible" for all intents and purposes. Therefore, we are not convinced that their teams would have to forfeit contests under the League's rules. Moreover, the League's inability to show an "exceedingly persuasive" justification for its discriminatory rule at this stage of the litigation makes a scenario wherein the boys lose at trial highly unlikely.